IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 16, 2004 Session

## WAYLAND MOSLEY v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

Appeal from the Circuit Court for Davidson County
No. 98C-876    Thomas W. Brothers, Judge

———————————

No. M2003-00756-COA-R3-CV - Filed - July 23, 2004

———————————

Metropolitan Government of Nashville and Davidson County appeals from the judgment of the trial court in favor of Plaintiff Mosley, a motorcycle patrolman, who was seriously injured in an on-duty motorcycle accident. Applying comparative fault principles the trial judge held Metro 75% at fault and Mr. Mosley 25% at fault for his injuries. Finding that Plaintiff has failed to establish cause-in-fact between the alleged defect in the helmet and the injuries to Plaintiff, we reverse the action of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Reversed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Francis H. Young, Nashville, Tennessee, for the appellant, Metropolitan Government of Nashville and Davidson County.

John M. Cannon, Goodlettsville, Tennessee and David L. Cooper, Nashville, Tennessee, for the appellee, Wayland Mosley.

**OPINION**

In this case tried before the Circuit Court of Davidson County without the intervention of a jury, Plaintiff Wayland Mosley, a motorcycle patrol officer for Metropolitan Government of Nashville and Davidson County, ("Metro") was operating his motorcycle in the line of duty on March 29, 1997. Mr. Mosley was operating his 1996 Harley-Davidson Road King motorcycle in formation near Cannery Row in downtown Nashville, when the formation undertook to execute a right turn. Mr. Mosley failed to adjust his speed to accommodate the turn and collided with the rear of Officer Leonard Keeler's motorcycle. As a result of this collision Mr. Mosley was thrown from

his motorcycle on to the pavement striking his helmet covered head on the pavement. The impact of the helmet and pavement tore the helmet from his head after which a second impact between Mr. Mosley's head and the pavement resulted in very serious head injuries to Mr. Mosley.

Mr. Mosley filed suit against his employer, Metro, the manufacturer of his motorcycle helmet, Hong Jin Crown, Inc., and HJC America, Inc., distributor of the motorcycle helmet, charging the manufacturer and distributor of the HJC/FG-2 half helmet involved in the accident with tortious misrepresentation of the quality and safety of the helmet, breach of implied warranties of merchantability and fitness, and negligent manufacture of a product which was defective and unreasonably and inherently dangerous. Plaintiff charged that Metro was negligent in maintenance of the helmet and caused a hazardous situation by supplying Plaintiff with a defective helmet creating an unsafe and dangerous condition. All Defendants answered denying liability with Metro pleading the affirmative defense of comparative fault. On June 6, 2002, Plaintiff filed a Notice of Voluntary Dismissal as to Defendants, HJC America, Inc. and Hong Jin Crown Corp. The case was tried on the issues drawn between Plaintiff and Defendant Metro. The trial court entered its order on March 12, 2003, finding in pertinent part:

> [T]he court made specific findings of fact and conclusions of law which are incorporated herein by reference and finds that the Defendant, Metropolitan Government of Nashville and Davidson County ("Metro"), has a duty to provide a safe work place for employees, considering the working environment and the reasonably foreseeable dangers of the work performance of a police officer. The Court finds that Metro had a duty to a provide proper and safe motorcycle helmet for the Plaintiff. The Court finds that two (2) officers complained to their supervisors about the helmet issued to Plaintiff, and that the defective condition of the helmet was general knowledge in the unit. The Court finds that Metro knew, or should have known, about the unreasonably dangerous condition of the helmet issued to Plaintiff, and that the helmet was defective and posed an unreasonable risk of harm due to the nature of the job. The Court also finds that based upon the testimony of Metro's representative, that upon notice of the condition of the helmet, the helmet should have been taken out of service. The Court further finds that it was reasonably foreseeable that injury could occur from the known defective condition of the helmet. The Court finds that due to the nature of the use of a motorcycle in police activities, that Metro had a higher duty to issue safe headgear to its officers. The Court finds that Metro was negligent in issuing the helmet to Plaintiff and failing to remove the helmet from service, and that this negligence was the proximate legal cause of the injuries to the Plaintiff.
>
> The Court further finds that the Plaintiff was negligent for not wearing a three quarter (3/4) helmet issued to the Plaintiff. However, the Plaintiff's fault is less [than] Metro's. The Court finds that the Plaintiff is attributed twenty-five percent (25%) of the fault, and that Metro is attributed seventy-five (75%) of the fault.

This negligence case is governed by the restricted abrogation of governmental immunity provided by the Tennessee Governmental Tort Liability Act Tenn. Code Ann. §§ 29-20-101, et seq. The total judgment against Metro was for the $130,000 maximum limits provided by the Tennessee Government of Tort Liability Act  Tenn. Code Ann. § 29-20-403.  Metro filed a timely appeal.

At remote common law, negligence consisted of three elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant breaching that duty, and (3) an injury that was proximately caused by the defendant's conduct.  *De-Glopper v.  Nashville Ry.  and Light Co.*, 123 Tenn.  633, 642-43, 134 S.W. 609, 611 (1911); *Shouse v.  Otis*, 224 Tenn. 1, 7, 448 S.W.2d 673, 676 (Tenn.  1969).  However, "The common law does not have the force of Holy Writ; it is not a last will and testament, nor is it a cadaver embalmed in perpetuity, nor is it to be treated like the sin of Judah--'written with a pen of iron and with the point of a diamond.'  Jeremiah 17:1."  *Dunn v. Palermo*, 522 S.W.2d 679, 688 (Tenn.  1975).

Continuing experience in negligence cases brought about evolutionary changes in the law defining tort liability.

> In 1991 the supreme court redefined these components by separating the injury component from the causation component and by bifurcating causation into two separate components.  Accordingly, common-law negligence causes of action are now understood to contain five elements; (1) a duty of care owed by the defendant to the plaintiff, (2) conduct by the defendant breaching that duty, (3) an injury or loss to the plaintiff, (4) causation in fact, and (5) proximate or legal cause.  *McClenahan v.  Cooley*, 806 S.W.2d 767, 774 (Tenn. 1991).

*Waste Management v.  South Central Bell*, 15 S.W.3d 425, 430 (Tenn.Ct.App.  1997).

As the element of "causation in fact" is determinative of the issues under the facts of this case, it is well to define comprehensively the meaning and scope of the term.  Judge Koch provided this definition in *Waste Management v. South Central Bell*, 15 S.W.3d 425 (Tenn.Ct.App. 1997).

> Causation in fact and legal cause are very different concepts, *Ridings v. Ralph M.  Parsons Co.*, 914 S.W.2d 79, 83 (Tenn. 1996); *Kilpatrick v.  Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993), and distinguishing between them has been hailed by some as one of the most helpful of the recent breakthroughs in negligence jurisprudence. *See, e.g.*, 4 *Fowler v.  Harper, et al.*, *The Law of Torts* § 20 .2 n.  1 (2d ed. 1986); Victor E.  Schwartz, *Comparative Negligence* § 4.1, at 89 (3d ed. 1994).  Causation in fact refers to the cause and effect relationship that must be established between the defendant's conduct and the plaintiff's loss before liability for that particular loss will be imposed. Joseph H.  King, Jr., *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale L.J. 1353, 1353 (1981).  On the other hand, legal cause connotes a policy decision by the judiciary to deny liability for otherwise actionable

conduct. *Bain v. Wells*, 936 S.W.2d 618, 625 (Tenn. 1997); *George v. Alexander*, 931 S.W.2d 517, 521 (Tenn. 1996). It requires the courts to establish the boundary of legal liability, *Kilpatrick v. Bryant*, 868 S.W.2d at 598, using mixed considerations of logic, common sense, justice, policy, and precedent. *Smith v. Gore*, 728 S.W.2d 738, 749 (Tenn. 1987); *Lancaster v. Montesi*, 216 Tenn. 50, 56, 390 S.W.2d 217, 220 (1965).

> The defendant's conduct must be a cause in fact of the plaintiff's loss before there can be liability under negligence or any other theory of liability. Harper, *supra*, § 22.16, at 400; Schwartz, *supra*, § 4-1(a), at 90. Thus, no negligence claim can succeed unless the plaintiff can first prove that the defendant's conduct was the cause in fact of the plaintiff's loss. *Lancaster v. Montesi*, 216 Tenn. at 55, 390 S.W.2d at 220 (stating that "[i]f . . . defendant's conduct . . . was not a factor in causing plaintiff's damage, that ends the matter."); *Drewry v. County of Obion*, 619 S.W.2d 397, 398 (Tenn.Ct.App. 1981) (stating that "[p]roof of negligence without proof of causation is nothing."); *Carney v. Goodman*, 38 Tenn. App. 55, 61, 270 S.W.2d 572, 575 (1954). The inquiry is not a metaphysical one, but rather a common sense analysis of the facts that lay persons can undertake as competently as the most experienced judges. Restatement (Second) of Torts § 431 cmt. a (1965); Harper, *supra*, § 20.2, at 91; W. Page Keeton, *Prosser and Keeton on the Law of Torts*, § 41, at 264 (5th ed. 1984).

*Waste Management v. South Central Bell*, 15 S.W.3d 425, 430 (Tenn.Ct.App. 1997).

Applying the Waste Management analysis described, it is seen that if causation in fact does not exist, liability does not exist, and one never reaches the issue of proximate or legal cause. In this case no issue is made relative to the cause of the motorcycle accident. The case focuses entirely on the helmet worn by Mr. Mosley, the impact of the helmet with the pavement, the separation of the helmet from the head of Mr. Mosley, and the second impact between Mr. Mosley's head and the pavement. The particular helmet in issue had been previously worn by Officer Jim Reed and was given to Mr. Mosley in December of 1996 when he replaced Officer Reed in the motorcycle unit. The HJC helmet was what is called a "half-helmet" and had been consistently used by police officers in the Metro motorcycle division. In the summer of 1996, Officer Reed had experienced a separation of the exterior fiberglass shell of the helmet from the internal styrofoam liner while operating his motorcycle on Interstate 24 when wind deflected by the windshield of the motorcycle was blowing in his face. He complained about this incident to his superiors but continued to wear the helmet until he transferred it to Mr. Mosley at the time he left the motorcycle division. It is this separation phenomenon which is asserted by the plaintiff to be the defect in the helmet. Mr. Mosley complained to Sergeant Jones about the helmet expressing concerns about the styrofoam liner separating from the hard shell of the helmet, but only after hearing of Officer Reed's experience, and never as a result of first-hand experience of the same separation. Nonetheless, on January 6, 1997, Mr. Mosley was issued a new 3/4 length helmet which was referred to as a "winter helmet." Most other motorcycle officers were likewise issued a 3/4 helmet, but they complained about the 3/4

length helmet asserting that it interfered with acoustics and peripheral vision. Motorcycle officers including Mr. Mosley continued to prefer the half-helmet, and Mr. Mosley continued to use the half helmet that was alleged to be defective. Metro did not take this particular helmet out of service but left it instead with Mr. Mosley. He was wearing this half helmet on the evening of the accident.

The primary complaint of the plaintiff is the alleged negligent failure of Metro to take this particular helmet out of service.

Cause-in-fact cannot be established by the simple process of finding Metro to have breached its duty in not taking the particular helmet out of service. An automobile with burned out taillights should certainly be taken off the road by the driver, and a failure to do so would constitute a breach of the applicable standard of care. If the same car with headlights operating is involved in a head on collision with an oncoming vehicle, nothing else appearing in the evidence, it is hard to imagine how the burned out taillights could be a cause in fact of the accident. By that same analysis, if the separation between the styrofoam liner and the plastic helmet is a defect, one might say Metro breached its duty to provide a safe workplace by failing to take the particular helmet out of service. If, however, Plaintiff offers no proof that this alleged defect was a cause in fact of his injuries the particular breach of Metro does not establish liability.

> One's first inquiry, in analyzing a situation such as is before us, is whether the alleged acts of defendant were a cause in fact of the injury. "If that inquiry shows that defendant's conduct, in point of fact, was not a factor in causing plaintiff's damage, that ends the matter. But if it shows his conduct was a factor in causing plaintiff's damage, then the further question is whether his conduct played such a part in causing the damage as makes him in the eye of the law the author of such damage and liable therefor." *Carney v. Goodman*, 38 Tenn. App. 55, 61, 270 S.W.2d 572, 575 (1954).

*Lancaster v. Montesi*, 390 S.W.2d 217, 220 (Tenn. 1965).

It is well settled in Tennessee that "proof of negligence without proof of causation is nothing." *German v. Nichopoulos*, 577 S.W.2d 197, 203 (Tenn.Ct.App. 1978); *Drewry v. County of Obion*, 619 S.W.2d 397, 398 (Tenn.Ct.App. 1981). The controlling issue in this case, therefore, is whether or not evidence exists in the record sufficient to support the proposition that the alleged defect in the helmet in fact caused injuries to Mr. Mosley. Since this case was tried without the intervention of the jury, our review is *de novo* upon the record with a presumption of correctness as to the trial court's factual determinations unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Our *de novo* review is also subject to the well established principle that the trial court is in the best position to assess the credibility of the witnesses and accordingly such determinations are entitled to great weight on appeal. *Vantage Technology LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn.Ct.App. 1999).

The testimonial record in this case presents little need for deference to the trial court on questions of credibility. The evidence is practically undisputed. Mr. Mosley was an outstanding motor-cycle officer and his credibility is not subject to serious doubt. He suffered serious injuries in the line of duty and has been forced to give up his career as a police officer and accept disability benefits. He tries his best to cope with his injuries and lead as productive a life as is possible for him, but the personal devastation to him and his family is obvious and permanent. The motorcycle officers serving with him at the time of the accident, including Officers Reed, Keeler, and DeBord, are supportive of Mr. Mosley and very credible.

The difficulty with the case for Plaintiff is that all of the testimony presented by his witnesses concentrates on an assertion that the separation of the helmet from the styrofoam liner that was experienced by Officer Reed in the summer of 1996 made this particular helmet defective and created a "safety issue." The insistence of Plaintiff and his witnesses is that because of this "safety issue" as to this particular helmet, Metro should have taken the helmet out of service and that if Metro had done so Mr. Mosley would not have been injured in the manner that he was. This quantum leap as to cause in fact simply cannot be made.

Officer Keeler describes the single incident in evidence whereby the separation between the helmet and the styrofoam liner occurred. Officer Reed was riding beside him in formation one day in the summer of 1996, traveling westbound on Interstate Highway 24 in Davidson County, and traveling about 65 miles per hour. He looked at Officer Reed and saw that apparently the wind deflected from the windshield of Officer Reed's motorcycle was blowing into his face and head and had effected a separation between the styrofoam liner and the plastic helmet. The result he observed was that the helmet had been pushed back on the head of Officer Reed exposing the front part of the styrofoam liner. This is the only incident in the record of any actual separation between the helmet and the styrofoam liner, and no other defect is asserted by Plaintiff.

Mr. Mosley, who inherited this particular helmet from Officer Reed, testified that he knew nothing of the I-24 incident until Officer Keeler notified him of it some time before this accident. In his own experience with the helmet Mr. Mosley never encountered such a separation and was always careful in keeping his chin strap fastened tightly enough to keep the helmet snug on his head. The chin strap is attached to the plastic helmet which fits over the styrofoam liner. Officer Reed testified that, after the summer of 1996 Interstate 24 incident, he simply tightened his chin strap and had no further difficulty with the helmet.

There is no testimony in the record that the styrofoam liner separated from the plastic helmet, either at the time Mr. Mosley collided with Keeler's motorcycle or when his helmeted head struck the pavement for the first time. Upon this impact with the pavement the helmet was simply jerked off of his head thus exposing his bare head to the second impact. When the helmet was retrieved the styrofoam liner was not separated from the helmet.

Cause in fact is a part of the plaintiff's burden of proof. "Thus, no negligence claim can succeed unless the plaintiff can first prove that the defendant's conduct was the cause in fact of the

plaintiff's loss." *Waste Management v. South Central Bell*, 15 S.W.3d at 430. For Plaintiff to succeed the court would have to assume based upon a single separation of the styrofoam liner and the plastic helmet, which occurred at a time months before the accident in issue when the motorcycle was being operated at 65 miles per hour, that such a separation happened during the accident in issue at a time when the motorcycle was being operated at a speed of 17 miles per hour and to further assume that such separation is what caused the first impact with the pavement to jerk the helmet from Plaintiff's head. In the absence of any proof this assumption simply cannot be made by the trier of fact. Even if such separation occurred between the helmet and the styrofoam liner how could it have caused the helmet to separate from the head of Mr. Mosley since the chin strap that holds the helmet in place is anchored to both sides of the plastic helmet itself?

The only expert testimony in the record is that of Metro's expert Halstead who testified that a slight looseness of the helmet liner would have no effect as relates to the helmet staying on Mr. Mosley's head. He further concluded from his examination of the helmet there were only two ways that the helmet could have come off Mr. Mosley's head in the accident: the first being that the helmet may be too large and the second being that the chin strap was not cinched tightly enough. He then rules out the helmet being too large since Mr. Mosley's head size was size 7 which fits snugly into this HJC medium helmet which is designed for sizes 7 to 7 1/4. There is neither allegation nor proof in the record that the chin strap was somehow defective. Actionable negligence cannot be inferred from the mere fact of the occurrence of injury alone. *Williams v. Jordan*, 346 S.W.2d 583, 586 (Tenn. 1961); *LaRue v. 1817 Lake, Inc.*, 966 S.W.2d 423, 428 (Tenn.Ct.App. 1997).

There is no question in this case that the accident happened in the manner established by the undisputed proof. It is likewise unquestionable that the helmet in issue had in the past separated from its' styrofoam liner and that Metro had notice of this condition. It is clear that Metro did not remove the helmet from service after notice of the condition. The case for Plaintiff fails in that Plaintiff presents no proof of causation in fact between the helmet-liner separation in the summer of 1996 and the injury Plaintiff suffered on March 29, 1997. We need not reach the comparative fault issue under these circumstances, but it is well to note that Mr. Mosley was just as familiar with the alleged defect in the helmet at the time of the accident as was Metro and did not choose to avail himself of the 3/4 helmet.

It is not a pleasant task to reverse this case wherein a capable and competent police officer has suffered severe injuries in performance of his duties. However, he voluntarily dismissed his case against the manufacturer and distributor of the helmet and went to trial against Metro alone. He presents no evidence of cause in fact between the alleged defect in the helmet and the injuries he suffered. On this basis we must reverse the judgment of the trial court and dismiss this case.

Costs of the cause are assessed to Appellant.

_____
WILLIAM B. CAIN, JUDGE